# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

P.G. a minor, by and through his parent,
Lynn-Ellen J. Graham,

                Plaintiffs,

                v.

**3 : 21 cv 2 57**

Civ. No.

HUBER HEIGHTS CITY SCHOOL DISTRICT
BOARD OF EDUCATION; Mr. Mario Basora,
in his individual capacity and in his official
capacity as Superintendent of the Huber City
School District; and Mark Combs, Shannon
Weldon, Kelly Bledsoe, William Harris and
Robert Mullins all in their individual capacities
and in their capacities as members of the Huber
Heights City School District Board of Education.

# THOMAS M. ROSE

# SHARON L. OVINGTON

                Defendants.

## COMPLAINT

    Plaintiffs, P.G. a minor, by and through his parent, Lynn-Ellen J. Graham, *pro se*, hereby

file this Complaint against Defendants, Huber Heights City School Board of Education ("School

Board"); Mr. Mario Basora, in his individual capacity and in his official capacity as

Superintendent of the Huber Heights City School District; and Mark Combs, Shannon Weldon,

Kelly Bledsoe, William Harris, and Robert Mullins, all individual elected officials sued in their

individual capacity and in their capacity as members of the School Board (collectively,

"Defendants"). In support of the claims set forth herein, Plaintiffs allege and aver as follows:

## PARTIES

1.     Plaintiff P.G. is a minor child who resides in Huber Heights City School District ("HHCSD"), in Montgomery County, Ohio. Plaintiff P.G. was at all times relevant hereto a student at a Huber Heights School District public school.  Suit is brought herein on P.G.'s behalf by his mother, Plaintiff Lynn-Ellen J. Graham.

2.     Plaintiff Lynn-Ellen J. Graham is an adult individual who is a resident and taxpayer in the Huber Heights City School District, in Montgomery County, Ohio. Plaintiff Lynn-Ellen J. Graham is the parent of Plaintiff P.G.

3.     Defendant Huber Heights City School District Board of Education (the "School Board" or the "Board") is a public entity which, acting under color of law, is responsible for the formulation and implementation of all official governmental laws, policies, regulations and procedures in effect for the Huber Heights City School District.

4.     Defendant Mr. Mario Basora was at all relevant times the Superintendent of the Huber Heights City School District; in that capacity, acting under color of law, he is responsible for the implementation of all official governmental laws, policies, regulations and procedures governing the Huber Heights City School District. He is sued in his official and individual capacities.

5.     Defendant Mark Combs is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Combs is currently the President of the School Board.

6.     Defendant Shannon Weldon, is a Montgomery County resident and member of the school Board, sued here in her individual and representative capacity.

2

7.     Defendant Kelly Bledsoe is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

8.     Defendant William Harris is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity.

9.     Defendant Robert Mullins is a Montgomery County resident and member of the School Board, sued here in his individual and representative capacity. Mr. Mullins is currently the Vice President of the School Board.

10.     At all relevant times hereto, the School Board and the individual Defendants were acting under color of state law.

## JURISDICTION AND VENUE

11.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §1331, 28 U.S.C. §§1343(a)(3), (4), 28 U.S.C. §1367, 28 U.S.C. § 2201, and 42 U.S.C. §1983.

13.     There exists an actual and justiciable controversy between Plaintiffs and Defendant requiring resolution by this Court.

14.     Plaintiffs have no adequate remedy at law.

15.     Venue is proper before the United States District Court for the Southern District of Ohio under 28 U.S.C. §1391 because all parties reside or otherwise are found herein, and all acts and omissions giving rise to Plaintiffs' claims occurred in the Southern District of Ohio.

## FACTS

16.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

**A.     Huber Heights City School District Board of Education**

17.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

The Huber Heights City School District Board of Education is "composed of five citizens who are representatives of the residents of Huber Heights, Ohio. Board members are elected 'at large' on a nonpartisan ballot and serve for staggered terms of four years."

Board - Huber Heights City Schools.

18.    The five individuals currently serving as School Board Members are Defendants Mark Combs, Shannon Weldon, Kelly Bledsoe, William Harris and Robert Mullins.

19.    Defendant Mr. Mario Basora, Superintendent of the District, holds a master's of education in educational leadership and administration, a license from the department of education for superintendent, and a bachelor's degree in Political Science.

20.    Defendant Mark Combs, the President of the School Board, has a Bachelor of Science in aeronautics and avionics engineering from the Saint Lois University. Mr. Combs has been on the Huber Heights City School Board since 2010. On January 18th 2018, Mr. Combs took an oath, during the school board meeting. Swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Member of the School Board (though he is now President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." Finding Mr. Combs Oath of Office was not attainable. **See Exhibit A**

21.    Defendant Shannon Weldon, a member of the school board since January of 2020. On January 9,

2020, During the school board meeting, Mrs. Weldon took an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully

and impartially discharge her duties as a Board Member to the best of her ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit B.**

22.     Defendant Kelly Bledsoe holds a bachelor's and master's degree in music from the University of Tennesse. On January 18th, 2018, Mr. Bledsoe took an Oath of Office, swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit C.**

23.     Defendant William Harris, On January 18th 2018,

Took an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit D.**

24.     Plaintiffs cannot confirm whether Defendant Robert Mullins, the Vice President of the School Board, holds a college degree. On January 9th, 2020, Mr. Mullins took an Oath of Office swearing to support the Constitution of the United States and the Constitution of the State of Ohio, and to faithfully and impartially discharge his duties as a Board Member (though he is now Vice-President of the School Board) to the best of his ability, and in accordance with the laws "now in effect and hereafter to be enacted." **See Exhibit E.**

25.     This five-member School Board unanimously appointed Defendant Mr. Mario Basaro to serve as Superintendent of Schools, effective July, 2019.

26.     As Superintendent, Mr. Basaro is charged with the administration of the HHCSD

**B.** **Relevant Policies of the Huber Heights City School District Board of Education**

28. Code AD of Section A Foundations and Basic Commitments of the School Board's policy manual, titled

"Development of Philosophy of Education" Provides,

The Board's philosophy of education gives direction to the educational program and daily operations of the district.

Periodically, the policy committee of the Board and the Superintendent evaluate the philosophy of education. Suggestions from both the staff and community are considered.

The committee revises or confirms the existing philosophy or writes a new statement of philosophy. The committee presents its recommendation regarding a philosophy of education to the Board for adoption or re-adoption.

All building and curriculum philosophies reflect and extend the Board's philosophy. The Superintendent disseminates the Board's philosophy of education to all staff members and directs that it be published in all handbooks

https://go.boarddocs.com/oh/huhe/Board.nsf/goto?open&id=BFGGWG45BCOO (Emphasis

added).

29. In addition, the Board's Policy Manual at Section A: Foundations and Basic Commitments. Code AA provides,

The United States Constitution grants the individual states responsibility for public education.

The Ohio General Assembly is under mandate by the Ohio Constitution to provide for the organization, administration and control of the public school system supported by public funds. The Ohio Constitution also mandates a

State Board of Education (SBOE) and a Superintendent of Public Instruction, the respective powers and duties of which are prescribed by State law.

The Ohio General Assembly has also established a State Department of Education (through which policies and directives of the SBOE and Superintendent of Public Instruction are administered) and has established specific types of school districts.

The Huber Heights City School District is classified as a city school district governed by a locally elected Board of Education.

https://go.boarddocs.com/oh/huhe/Board.nsf/goto?open&id=BFGGWG45BC00 (Emphasis Added).

29.     Furthermore, for its "STATEMENT OF PHILOSPHY", the Policy Manual at

Section A Code ADA/ADAA, declares,

The primary purposes of a public school are to help young people to gain knowledge, to develop the habit of being lifetime learners, and to develop the skills to apply this knowledge throughout their lives in solving problems and making decisions.

The Huber Heights City Schools will be a dynamic force providing an opportunity for students' social, emotional, intellectual, and physical development, in concert with the home, through their educational and activity programs. This learning process will be implemented by a qualified professional using effective teaching methods in a well-managed learning environment.

The Huber Heights City School District is committed to student learning of the fundamental skills of all academic disciplines appropriate to the student's level. Students will demonstrate reasoning ability that is necessary to make intellectual decisions. They will be assisted in developing physical skills,

positive work habits, and aesthetic appreciation for enjoyment and fulfillment of life. Furthermore, the Huber Heights City School District is committed to developing the characteristic traits of good citizenship to enable each child to achieve a realistic, positive self-image.

The Huber Heights City Schools will provide a learning environment that will be responsive to the differences, abilities, and interests of students. There will exist Districtwide services that provide for the identification and placement of students into appropriate education programs based on special needs. There will also exist an opportunity for each student to participate with peers in both the regular curriculum and the classroom setting to the extent that it is educationally and socially beneficial. As part of the learning environment, the district will offer a co-curricular program of school activities to round out its educational program.

The Huber Heights City School District attaches a high priority to the selection, in-service training, evaluation and retention of the most qualified certified staff, and it is committed to maintaining a teaching environment conducive to learning. This philosophy mandates allowance of varied methods of operation, including carefully selected, innovative programs within the classroom, and allows classroom information and discussion in which diverse points of view, including that those that are controversial, can be studied.

All decisions and actions of teachers, administrators, and the Board of Education should further the effort of the district to honor its own philosophy and fulfill its stated goals.

**Mission Statement**

Empowering our students to be academically and socially prepared for their future through the support of excellent teachers and staff, families, and community partners.

https://go.boarddocs.com/oh/huhe/Board.nsf/goto?open&id=BFGGWG45BC00(Emphasis added).

      30.      The Board Policy also provides in Section B, BF, in pertinent part,

Proposals regarding Board policies and operations may originate at any of several sources, including students, community residents, employees, Board members, consultants or civic groups. A careful and orderly process is used when examining policy proposals prior to Board action.

The formulation and adoption of written policies constitute the basic method by which the Board exercises its leadership in the operation of the district. The study and evaluation of reports concerning the execution of its written policies constitute the basic method by which the Board exercises its control over District operations.

The formal adoption of policies is recorded in the minutes of the Board. Only those written statements so adopted and recorded are regarded as official Board policy.

Final action by the Board on proposals shall be in accordance with this policy. The Board takes action on most matters on the basis of recommendations presented by the Superintendent.

The Superintendent bases his/her recommendations upon the results of a study and upon the judgment of the staff and study committees.

Policies introduced and recommended to the Board should not be adopted until a subsequent meeting in order to permit further study and provide opportunity for interested parties to react.

Unless otherwise specified, a new policy or policy amendment is effective as of the date of adoption by the Board and supersedes all previous policies in that area. Unless otherwise specified, the repeal of a policy is effective as of the date the Board takes such action.

Https://go.boarddocs.com/oh/huhe/Board.nsf/goto?open&id=BFGGWG45BC00. (Emphasis added).

31. Moreover, Section E, Code EBC, titled "Emergency Management and Safety Plans", provides, in pertinent part,

The Board acknowledges that the safety and well-being of students and staff are high priorities. Although emergencies cannot be predicted, effective prevention and management strategies are used to minimize the effects of emergency situations arising in the district.

An emergency is defined as a serious, unexpected, and often dangerous situation requiring immediate action that threatens the actual safety and security of students, employees or visitors of the district or whose impact threatens the feeling of safety and security, both of which are detrimental to a positive learning environment. Emergencies or hazards include, but are not limited to, an active shooter, hostage situations, bomb threats, bullying, fire, natural disasters, medical emergencies, industrial accidents, suicide, death of a student or employee, acts of violence, trauma and terrorism.

http://go.boarddocs.com/oh/huhe/Board.nsf/goto?open&id=BFGGWG45BCOO.

32. Additionally, Huber Heights Board Policy Section E, Code EBEA , adopted by the Board on July 28, 2020 and attached hereto as **Exhibit F**, explains The Huber Heights City School District recognizes its responsibility relative to student, employee, vendor, and visitor health and safety. The spread of certain communicable diseases, specifically those that are transmitted via respiratory droplets, may be limited by use of face coverings, including face masks and other face shields (including, but not limited to cloth/fabric face masks and face shields that wrap around the face, extend over the nose and below the chin). In order to maintain a safe and healthy school environment, and reduce the potential spread of communicable disease, the Board complies with all federal, state, and local legal mandates intended to protect the health and safety of the district's students, employees, and visitors; including requirements to implement and enforce the use of face coverings while on District property and/or during offsite school events and programming. The Superintendent shall establish procedures and requirements regarding the use of face coverings by District students, staff, vendors, and visitors, in compliance with legal requirements and any orders issued by the Ohio Department of Health, local departments of health, the Ohio Department of Education or other entities authorized to regulate health or education within the state. In developing such procedures and regulations, the Superintendent also will consider available medical science and recommendations set forth by the Centers for Disease Control and Prevention, U.S. Department of Education, Ohio Department of Health and local departments of health. The Superintendent shall update the procedures and requirements regarding the use of face coverings as needed based on changes to the law, orders or recommendations from the above-named entities. The district's procedures and requirements regarding face coverings are made publicly available in the Huber Heights City Schools Back to School Plans **Exhibit G.** Notably, the Policy states, "While we fully understand the concerns with

11

wearing face coverings and challenges, they present for students, we need to follow the guidance of the health experts at the Centers for Disease Control & Prevention and the Ohio Department of Health. Huber Heights City Schools is requiring that face coverings be worn by all students, staff, and visitors to our building at all times, while on school grounds and at school sponsored events. Exceptions to this include those with a medical condition (with a doctor's note requesting the exemption) or a disability (documented in the child's IEP or 504 plan) preventing the wearing of the mask, or those communicating with someone with a disability (only when necessary for communication purposes); when in a classroom or office alone; while playing an instrument with the band; while eating breakfast or lunch during designated times at designated locations; or while vigorously exercising in physical education class or on a sports team.

33. Finally, Huber Heights Board Policy Section B, BBFA, titled "Board Member Conflict of Interest", provides, in pertinent part,

The Board and individual members follow the letter and spirit of the law regarding conflicts of interest.

A Board member will not have any direct or indirect pecuniary interest in a contract with the district; will not furnish for remuneration any labor, equipment or supplies to the district; nor be employed by the Board in any capacity for compensation.
The law specifically forbids:

1. a Board member from authorizing, or employing the authority or influence of his/her office to secure authorization of, any public contract in which he/she, a member of his/her family or his/her business associates have an interest;

2. a Board member from having an interest in the profits or benefits of a public contract entered into by, or for the use of, the district and

3. a Board member from occupying any position of profit during his/her term of office or within one year thereafter in the prosecution of a public contract authorized by him/her or a board of which he/she was a member at the time of authorization of that contract.

See attached **Exhibit H** (emphasis added).

## C. MCSD's COVID-19-Based Measures

34. In May of 2021, the HHCSD, through Defendant Mr. Mario Basora, issued its "Covid-19 Response Plan Summer/Fall 2021". See **Exhibit I**. In its "Covid-19 Response Plan Summer/Fall 2021", the HHCSD states, "All COVID restrictions will be lifted on June 2. Until then, all current restrictions will remain in place." Those restrictions lifted included Mask wearing and remote learning options would no longer be available. Also is stated that, the district will no longer quarantine individuals who are in close proximity to a positive case of COVID-19. The Plan also included a statement that "Policies and guidelines are subject to change, based on local, state, and federal rules/orders and legislation.

35. On August 30, 2021, Defendant Mr. Mario Basora, held a Facebook live on the Huber Heights City Schools page. The Facebook live was to discuss the amount of new covid cases that were affecting the district. During that live, Mr. Basora stated that "The number of new cases had doubled in the first 12 days of this school year. Based on the positive cases around the same time frame as last year." He has stated that because of the rise in numbers that the high school would likely be put back on remote learning for two weeks through September 14, 2021.

Mr. Basora also pleaded to students and staff to, if eligible they should get the covid-19 vaccine. That it was free and that plenty of information would be available at school. That to me is pure coercion and intimidation. As the vaccine is extremely politicized. It is in no way the superintendents job to prescribe medical advice.

36. On September 1, 2021 I attended the HHCDS special meeting in regards to the boards "Return to In Person Instruction and Continuity of Services Plan. The board listened to community feedback in regards to masking, or not masking the children. At that meeting Mr. Basora discussed his Covid-19 Response Plan, and stated that "per the CDC the best line of protection in regards to the Sars-2 virus is that children should wear masks". Along with Mr. Basora's masking plan, he also stated that "the district would no longer be contact tracing covid cases". His reasoning was that there were not enough employees and or resources as in money to do so. He did also state that if the action was passed tonight that starting September 7th, 21 that the students in staff would start wearing masks, but that contact tracing would immediately stop. **Exhibit Q.** As of this date, there is **no state-wide required masking mandate** for the 2021-2022 school year for staff or students.

**D: Damages inflicted on my family. Not of our own doing.**

37. I Lynn-Ellen Graham, am suing the Huber Heights City School Board for going against my constitutional rights as a parent, to decide what is medically best for my child. My son who I am suing on behalf of has been a student at Huber Heights City School district since 2019. He had attended Wright Brother Elementary from Kindergarten through 2nd grade. My son was

homeschooled through HHCSD in 2nd grade, since it was something that was offered. Homeschooling was chosen because children were required to wear masks. Due to the school boards policies in regards to masking children. I decided it was best to pull my child from the public schools, prior to the 2021-2022 school year, since homeschooling was no longer an option provided by the district. My fiancé has been homeschooling my son since the beginning of this school year. As well as 2020-2021 school year sense he was doing school at home through the school district.

38. Due the school board not following federal and state laws in regards to their authority to make decisions for my child in regards to a medical device. I am now a one income household with a family of five. My fiancé who was the bread winner of our family had to quit his job to homeschool my son. Since then, we have gone into massive debt, and I myself have had to contemplate bankruptcy. All so I can keep my home. All in all, my fiancé and I have lost out on roughly 100,000.00 dollars, in wages that could have been earned, had my child been able to have freedom of choice in regards to wearing a mask.

39. I as an American citizen have rights that were provided to me per the United States Constitution, that our fore fathers so brilliantly crafted. For times such as these. There is no law that states a school board, or a school board superintendent supersedes, my rights as a parent. By mandating MY CHILD wear a mask again, the board is not only taking away my right as a parent for informed consent for a medical device. The decision of the board is also taking away my child's rights in regards to a non-discriminatory education. Which by not allowing children who do not want to wear a mask go to school, does just that. My child misses his friends from school and wishes he could go back to school. However, he doesn't want to have to wear a mask for 7 hours a day. I as his mother will not force him to do so either, when I know when worn for multiple hours it can deplete his oxygen levels.

**E. The Masking Requirement Causes Immediate and Irreparable Harm to Students, Staff, and Community.**

40. In his Affidavit, attached hereto as **Exhibit J, Stephen** E. Petty, an expert in the field of Industrial Hygiene who has testified as to the futility and danger caused by an individual wearing a mask in order to avoid transmitting or becoming infected with Covid-19, states the following:

***

1. I hold relevant industry certifications including board certifications as a C.I.H. (Certified Industrial Hygienist), a C.S.P. (Certified Safety Professional), and as a P.E. (Professional Engineer) in six states (Florida, Kentucky, Ohio, Pennsylvania, Texas and West Virginia). My curriculum is attached hereto as **Exhibit i.**

2. I have served as an expert in personal protective equipment and related disciplines in approximately 400 legal cases. I have often been certified as, and provided testimony as, an expert in these areas. My list of representative cases is attached hereto as **Exhibit ii.**

3. For example, I am currently serving as an expert in the Monsanto Roundup and 3-M PFAS litigation. Recently I testified in four trials for the DuPont C-8 litigation.

4. I taught Environmental and Earth Sciences as an adjunct professor at Franklin University.

5. I hold nine U.S. patents, most related to heating, ventilation and air conditioning (HVAC) systems.

6. I am a current member in good standing of the following relevant associations: American Industrial Hygiene Association (AIHA), American Board of Industrial Hygiene (ABIH), American Conference of Governmental Ind. Hygienists (ACGIH), American Institute of Chemical Engineers (AIChE), American Society of Refrigeration, Air Conditioning and Refrigeration Engineers (ASHRAE); Member ASHRAE 40 Std. and TC 2.3, and Sigma Xi.

7. I am an expert in the field of Industrial Hygiene, which is the science and art devoted to the anticipation, recognition, evaluation, and control of those environmental factors or stressors — including viruses — arising in or from the workplace, which may cause sickness, impaired health and

well-being, or significant discomfort among workers or among the citizens of the community.

8. Industrial Hygiene is fundamentally concerned the proper methods of mitigating airborne/dermal hazards and pathogens, as well as with the design and use of engineering controls, administrative controls and personal protective equipment, among other things.

9. Medical doctors, virologists, immunologists, and many public health professionals are not qualified experts in these areas by virtue of those aforementioned credentials.

10. On May 7, 2021, the Centers for Disease Control (CDC) updated its guidance, providing that the primary mechanism for transmission of Covid-19 is through airborne aerosols, and not, as previously stated, by touching contaminated surfaces or through large respiratory droplets, as also stated during previous periods of the pandemic.

11. Airborne viral aerosols can consist of a single viral particle or multiple viral particles clumped together, and usually smaller than 5 μ (microns) in size. By comparison, droplets are >5 μ to >10 μ in size.

12. A square micron is approximately 1/4000th the area of the crosssection of a human hair and 1/88th the diameter of a human hair. Covid particles are —1/10 of a micron or —1/40,000th the area of a cross section of a human hair or —1/1,000th the diameter of a human hair.

13. A recent University of Florida study capturing air samples within an enclosed automobile cabin occupied by a Covid-positive individual showed that the only culturable Covid-19 virus samples obtained were between 0.25μ to 0.5μ in size. Particles smaller than 5μ are considered very small and/or very fine or aerosols.

14. Very small particles do not fall by gravity in the same rate that larger particles do and can stay suspended in still air for a long time, even days to weeks.

15. Because they stay suspended in concentration in indoor air, very small particles can potentially accumulate and become more concentrated over time indoors if the ventilation is poor.

16. Very small airborne aerosols pose a particularly great risk of exposure and infection because, since they are so small, they easily reach deep into the lung. This explains in part why Covid-19 is so easily spread, and why so little Covid-19 is required for infection.

17. Exposure to airborne aerosols is a function of two primary parameters: concentration and time. Less is better regarding both parameters.

18. For many reasons, personal protective equipment (PPE) is the least desirable way to protect people from very small airborne aerosols. Moreover, masks are not PPE since they cannot be sealed and do not meet the provisions of the Occupational Safety and Health Administration (OSHA) Respiratory Protection Standard (RPS), namely 29 CFR 1910.134.

19. Regarding PPE, facial coverings do not effectively protect individuals from exposure to very small airborne aerosols. A device referred to as a respirator is required to provide such protection.

20. The AIHA, in their September 9, 2020 Guidance Document for COVID-19 (**Exhibit iii**) noted that the acceptable relative risk reduction methods must be ≥90%; mask were shown to be only 10% and 5% (see Exhibit iii - Figure 2) and far below the required 90% level.

21. Similarly, Shah, et al, 2021 (**Exhibit iv**), using ideally sealed masks and particles 1 micron in size, reported efficiencies for the more commonly used cloth masks and surgical masks of 10% and 12% respectively. No mask can be perfectly sealed, thus "real world" effectiveness would be even lower.

22. Industrial hygienists refer to a "Hierarchy of Controls" that are typically implemented to minimize exposures, including exposures to very small airborne aerosols like Covid-19.

23. Regarding practical or "engineering" controls, industrial hygienists focus on practices that dilute, destroy, or contain airborne hazards (or hazards in general).

24. PPE — especially facial coverings — do not dilute, destroy, or contain airborne hazards. Therefore, facial coverings do not appear anywhere in the Industrial Hygiene (IH) Hierarchy of Controls for very small airborne aerosols like Covid-19. Even respirators (part of the PPE Category and not masks) are in the last priority on the Hierarchy of Controls.

25. Facial coverings are not comparable to respirators. Leakage occurs around the edges of ordinary facial coverings. Thus, ordinary facial coverings do not provide a reliable level of protection against inhalation of very small airborne particles and are not considered respiratory protection.

26. For example, during the seasonal forest fires in the summer of 2020, the CDC issued public guidance warning that facial coverings provide no protection against smoke inhalation. That is because facial coverings do not provide a reliable level of protection against the small particles of ash contained in smoke. Ash particles are substantially larger than Covid-19 aerosolized particles.

27. I have reviewed the Mayfield City School District (MCSD) "Protective Facial Covering Policy During Pandemic/Endemic Events" as set forth in the Policy Manual of the MCSD Board of Education.

28. Ordinary facial coverings like the ones required by the MCSD facial covering policy do not meet any of the several key OSHA Respiratory Protection Standards for respirators.

29. Because of the gaps around the edges of facial coverings required by MCSD's policy, they do not filter out Covid-19 aerosols. The policy stating masks will be worn without gaps defies known science that masks worn today cannot be sealed and always have gaps.

30. The effectiveness of a cloth facial covering falls to zero when there is a 3% or more open area in the edges around the sides of the facial covering.

31. Most over-the-counter disposable facial coverings have edge gaps of 10% or more. When adult-sized facial coverings are used by children, edge gaps will usually greatly exceed 10%.

32. Even short breaks (e.g., to eat) expose individuals to Covid-19 aerosols in indoor spaces.

33. Ordinary cloth facial coverings like the ones required by the MCSD mask requirement do not provide any filtering benefit relative to particles smaller than 5μ if not sealed.

34. Substantial mitigation of Covid-19 particles could be immediately achieved by:

    a. opening windows and using fans to draw outdoor air into indoor spaces (diluting the concentration of aerosols),

    b. setting fresh air dampers to maximum opening on HVAC systems,

    c. overriding HVAC energy controls,

    d. increasing the number of times indoor air is recycled,

     e.   installing needlepoint ionization technology to HVAC intake fans, and

     f.   installing inexpensive ultraviolet germicide devices into HVAC systems.

35.    All of the above-referenced techniques are more effective and meet standard industrial hygiene hierarchy of controls (practices) for controlling exposures in place for nearly 100 years. The use of cloth facial coverings does not fit within these basic hierarchy of controls since masks are not PPE and cannot be sealed. There are no OSHA standards for facial coverings (masks) as respiratory protection.

36.    Extended use of respiratory PPE is not indicated without medical supervision.

37.    As explained in an article titled "Is a Mask That Covers the Mouth and Nose Free from Undesirable Side Effects in Everyday Use and Free of Potential Hazards?" that was published on April 20, 201, in the *International Journal of Environmental Research and Public Health* and that is attached to this Affidavit as **Exhibit iv**, the following negative effects from wearing masks was reported in the literature:



**Figure 5.** Diseases/predispositions with significant risks, according to the literature found, when using masks. Indications for weighing up medical mask exemption certificates.

Example statements made in the paper include the following: "The overall possible resulting measurable drop in oxygen saturation (O2) of the blood on the one hand and the increase in carbon dioxide (CO2) on the other contribute to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase, in some cases also to a significant blood pressure increase." Exhibit iv, p. 25. In fact, "Neither higher level

institutions such as the WHO or the European Centre for Disease Prevention and Control (ECDC) nor national ones, such as the Centers for Disease Control and Prevention, GA, USA (CDC) or the German RKI, substantiate with sound scientific data a positive effect of masks in the public (in terms of a reduced rate of spread of COVID-19 in the population)." Exhibit iv, p. 24. For these reasons, students who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, or damage.

38. In summary:

   a. PPE is the least desirable way to protect people from very small airborne aerosols.

   b. Facial coverings as required by the HHCSD policy are not recognized as PPE since they cannot be sealed and are not covered by the OSHA RPS.

   c. If PPE were to be used for protection, respirators, not facial coverings as required by the HHCSD policy are needed to provide any effective protection from very small airborne aerosols.

   d. Very small aerosol particles are more likely to be a greater cause of disease than respiratory droplets because they can evade PPE and reach deep into the lungs, whereas respiratory droplets have to work against gravity in order to travel up a person's nose into the sinus.

   e. Much better alternatives to controlling exposure are available (i.e., engineering controls of dilution – ventilation with increased fresh air and destruction), and should be used to minimize exposures as opposed to masks.

   f. Individuals who are required to wear masks pursuant to a mandate suffer immediate and irreparable injury, loss, and damage due to the overall possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

50.    Plaintiffs note that the state of Ohio was given $4,475,243.513 pursuant to the American Rescue Plan ("ARP") Act of 2021 by agreeing to implement the federal guidelines set forth by the CDC for COVID-19 mitigation efforts.  See the attached letter from the U.S. Secretary of Education, attached hereto as **Exhibit 45**.  See also, https://oese.ed.gov/files/2021/07/Ohio-ARPESSER-State-Plan-Highlights-v2-071421.pdf.  The letter links to the CDC guidelines available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/ operationstrategy.html].  The guidelines suggest that a school board would forfeit ARP allocations by making masks optional, and states that have prohibited mask mandates in schools have received letter notifying them that they will not receive ARP funds.  Accordingly, it seems Defendants have a financial incentive for implementing the mask mandate, despite that such a requirement serves no scientific purpose and subjects individuals who wear masks to the health risks discussed above.

51.    Plaintiff s Lynn-Ellen Graham, in her own capacity and on behalf of her minor child, P.G., is aggrieved by the immediate and irreparable injury, loss, and damage suffered by P.G. because P.G. is now having to stay at home an additional year, pursuant to the School Board's mask mandate, which is not only unsupported by science, but which also results in the possible resulting measurable drop in oxygen saturation of the blood on one hand and the increase in carbon dioxide on the other, which contributes to an increased noradrenergic stress response, with heart rate increase and respiratory rate increase and, in some cases, a significant blood pressure increase.

### COUNT I - 42 U.S.C. §1983 - Violation of Procedural Due Process
### (5th and 14th Amendments) Against All Defendants

52.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

53. In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

54. In the instant case, Defendants unquestionably acted under the color of state law.

55. Each Individual Defendant is an elected, voting member of the Huber Heights City School District Board of Education with the exception of Defendant Mr. Mario Basora, who is the Superintendent of the Huber Heights City School District.

56. Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law. U.S. Const. Ann., Amendment V.

57. The Fourteenth applies the protections of the Fifth Amendment to state actors. U.S. Const. Ann., Amendment XIV.

58. Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

59. Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation occurred with no notice or meaningful opportunity to be heard as the Superintendent instated the mask mandate prior to offering an opportunity for public discussion. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates the Fifth and Fourteenth Amendments of the Unites States Constitution.

**COUNT II - 42 U.S.C. §1983 - Violation of Substantive Due Process**
**(Fourteenth Amendment) – Against All Defendants**

60.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

61.    In order establish a claim under section 1983 of the Civil Rights Act, a plaintiff must prove a Defendant: (a) acted under the color of state law; (b) proximately causing; (c) the Plaintiff to be deprived of a federally protected right. 42 U.S.C. §1983.

62.    In the instant case, Defendants unquestionably acted under the color of state law.

63.    Each individual Defendant is an elected, voting member of the Huber Heights City School District Board of Education with the exception of Defendant Mr. Mario Basaro, who is the Superintendent of the Huber Heights City School District.

64.    Under the Fourteenth Amendment to the Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

## COUNT III - Violation of Procedural Due Process
## (OH Const. Art. I, § 16) Against All Defendants

65.    Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

66.    Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

67.    Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

68.    Plaintiffs have constitutionally protected interests in the benefits that come from the not being subject to the Board's mask mandate, including the ability to pursue an education without being subjected to health risks that are not offset by any scientifically provable benefits.

24

69.     Defendants' implementation of the mask policy unlawfully deprives Plaintiffs of these and other constitutionally-protected interests without due process of law. Such deprivation was arbitrary, capricious, based on ignorance without inquiry into facts, and in violation of the School Board's own policies and other applicable laws. Such deprivation violates Article 1, § 16 of the Ohio Constitution.

## COUNT IV - Violation of Substantive Due Process (OH Const. Art. I, § 16) Against All Defendants

70.     Plaintiffs incorporate the foregoing paragraphs as if set forth in full herein.

71.     Article 1, § 16 of the Ohio Constitution provides, "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay. Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

72.     Article 1, § 16 of the Ohio Constitution affords the people of Ohio with right to be free from violations of the procedural due process rights, and no person may be deprived of life, liberty, or property without due process of law.

73.     Under Article 1, § 16 of the Ohio Constitution, and as established by state law including the state created danger doctrine, Plaintiffs have a fundamental right to a public education and to an education in a safe and healthy environment.

## RESERVATION OF RIGHTS

Plaintiffs herein expressly reserve their rights in regards to any additional claims to which they may be entitled under federal law as well as under the laws of the State of Ohio, including claims arising from any violations or actions of misconduct that may have been committed by Defendants. Plaintiffs expressly place Defendants on notice of Plaintiffs' intention to initiate

removal proceedings at the state court level against Defendants as a result of the infractions Defendants have committed, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.     Assume jurisdiction of this action;

b.     Vacate and set aside the Defendants' mask mandate as well as any other action taken by Defendants to institute the mask mandate and implement the provisions of the mask policy;

c.     Declare that the Defendants' masking policy is void and without legal force or effect;

c.     Declare that the institution of the mask policy and actions taken by Defendants to implement the mask policy are arbitrary, capricious, based on ignorance due to failure to inquire into facts, otherwise not in accordance with law, and without observance of required procedures;

d.     Declare that the mask policy and the actions taken by Defendants to implement the mask policy are in violation of the Constitution and contrary to the laws of the United States and the State of Ohio;

e.     Temporarily restrain, as well as preliminarily and permanently enjoin Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the mask policy and from taking any other action to implement the masking policy that is not in compliance with applicable law; and

f.     Grant such other and further relief as may be just, equitable, and proper including without limitation, an award of attorneys' fees and costs to Plaintiffs.

Respectfully submitted this September 9th, 2021

*/s/Lynn-Ellen Graham*
6822 Haddon Place Huber Heights, OH
45424 xxx-xxx-xxx  (Telephone)

*Lynn-Ellen Graham, Individually and on behalf
of her minor child P.G.*